**CADDO ROCK DRILL BIT CO. v. REED et al.**

(District Court, S. D. Texas, at Houston. February 3, 1925.)

No. 494.

**1. Patents ⬳218(1)—License contract construed as to expenditures by licensee.**

Under a contract by which plaintiff assigned patents to defendant, which agreed to manufacture thereunder and to pay plaintiff royalties on sales, and by which plaintiff agreed to protect the patents against infringement and that funds advanced by defendant "for the account and protection of the interests of" plaintiff should be deducted from royalties due, defendant is not entitled to deduct expenditures made in defending an unsuccessful suit by plaintiff for cancellation of the contract.

**2. Patents ⬳218(1)—Party not liable for expenses incurred in defending infringement suit on lubricator sold in connection with bits under license contract.**

Under a contract by which plaintiff assigned patents for a drill bit to defendant for the purpose of manufacture and sale of the bits on a royalty basis, and by which plaintiff contracted to save defendant harmless against claims of infringement by others and to pay any judgment recovered against it therefor, expense incurred by defendant in defending such a suit *held* chargeable to plaintiff up to the time it was determined by the court that the bit did not infringe, but not including expense incurred thereafter in the suit, nor a judgment recovered therein against defendant for infringement by a lubricator sold in connection with the bits, but which was not covered by the patents assigned and on which defendant did not pay royalty.

At Law. Action by the Caddo Rock Drill Bit Company against C. E. Reed and others. Judgment for plaintiff.

Andrews, Streetman, Logue & Mobley, of Houston, Tex., for plaintiff.

B. F. Louis, of Houston, Tex. (William F. Hall, of Washington, D. C., of counsel), for defendants.

HUTCHESON, District Judge. This is a suit at law by the plaintiff to recover royalties due it under a contract with defendants assigning to them certain inventions, which contract is set out at the foot of this opinion.

The defendants admit their liability for the royalties shown in their reports, amounting to $208,651.80 with interest at 6 per cent. from the date of the accrual of each of the items. Plaintiff accepts these reports as correct, and but for the claims of offsets to this recovery, which claims arise out of a series of colorful litigations between Reed et al. and Hughes Tool Company et al., the case would be disposed of upon the admissions of the parties, by judgment for the plaintiff for the above amount.

Through a long period of years, Howard R. Hughes, now deceased, and C. E. Reed have been engaged in litigations of various kinds and in widely separated forums, over the use of drilling tools and equipment covered by conflicting patent claims, in which litigations considerable sums of money were expended by Reed, and one of which resulted in a judgment of nearly $200,000 in favor of Hughes. These offsets, arising out of five distinct suits, are set out in detail in exhibits attached to defendants' pleadings as follows:

(1) Offsets for costs and expenses in in-

terference No. 36133, Hughes v. Humason, Exhibit A, amounting to $2,430.

(2) Costs and expenses incurred in two litigations brought by plaintiff against defendants to cancel the contract out of which the royalties here sued for spring, these litigations being a suit in the Fifty-Fifth district court of Harris county, Tex., and one in the First district court and the Supreme Court of Louisiana, shown in Exhibit B attached to defendants' answer.

(3) Items for advances in equity suit No. 72, in amount $6,153.70, shown by Exhibit C.

(4) Advances for costs and expenses in equity No. 124, together with the amount of the judgment recovered in said cause by the Hughes Tool Company against the defendants.

These offsets are claimed under the terms of the royalty contract between Caddo and Reed, as expenses incurred in defending the assignment and the interests of Caddo Rock Drill Bit Company in the royalties from the patented devices assigned.

The plaintiff admits, as proper deductions from its claim, the offsets shown in Exhibits A and C, and these pass out of the picture.

The plaintiff denies responsibility for any of the items set out in Exhibits B and D, claiming that they are not properly allowable as offsets, but admits that if they rest upon a proper basis in law, he has no quarrel with the amounts stated, and will give defendants credit for all the items, with the following exceptions:

Exhibit B, the item of November 30, C. E. Reed, time, $3,000.

Exhibit D, the following items:

"Item Nov. 30, 1921, $5,000.00. (2) Item Jan. 31, 1923, $833.33. (4) Item March 19, 1923, $833.34; and except the following items of expense C. E. Reed, to wit: (1) Oct. 20, 1920, $1,175.31; (2) item Feb. 23, 1923, expense railroad fare, San Francisco, $397.44; (3) item Feb. 23, 1923, expense trip California, $1,000.00, and further excepting all items of time of other employees as follows: (1) Item Feb. 29, 1923, expense California, Wiggins, $375.00; (2) item Feb. 28, 1923, time (C. E. Reed) Monis, $45.00; (3) March 31, 1923, G. C. Danielson, time, $250.00; further excepting the two items of premiums on bonds of date Nov. 28, 1924, $1,000.00, and Nov. 19, 1924, $2,500.00; and further excepting the item of Dec. 2, 1920, bits, etc., used in suit $550.00."

These admissions, which remove from the case all accounting features, have narrowed the controversy down to two principal inquiries: (1) Whether the defendants are entitled to offset the expenditures incurred in the defense of the suits by plaintiff to annul the contract referred to in Exhibit B; and (2) for judgment and advances in equity No. 124, this second matter being divided (a) into the claim of defendants for offset of judgment and all of the advances, and (b) failing in that, a claim for advances and expenses prior to the decree of May 18, 1921 in equity No. 124, which adjudged defendant an infringer as to the lubricator and acquitted it as to the drill bits.

In determining the correctness of these offsets, it must be borne in mind that this is a suit by plaintiff upon a contract which furnishes not only the measure of defendants' obligation to the plaintiff, but of plaintiff's correlative obligations to the defendants.

Much of the argument in this case by defendants, both oral and written, and some of the observations of the court from the bench, have swung out of this compass, and have assumed to treat the relations of the parties as though governed by general or abstract principles, and not by a specific and fixed contract within the limits of which all the rights and obligations of the parties must be found.

The controlling features of that contract are abstracted by defendants in their brief, pages 14, 15, 16, and 17, and I adopt that abstract:

"Throughout the contract it is apparent that the parties intended and expected the defendants not only to market the drill bits covered by the patent, but to embody improvements thereon and make additions thereto, and that it was contemplated, as is apparently the case in the marketing of all patented devices, that infringement suits would have to be met, and the contract undertook to fully indemnify defendants against such; this idea runs through the contract, as will be noted from the following references thereto:

" ' * * * Are desirous of placing on the market drill bits embodying improvements covered by said application and patents.'

"And in the second whereas clause it is stated that the second party desires to have all the privileges under the patents, ' * * * in respect to the use and sale of said inventions and improvements thereof.'

"Under section I there is granted the sole and exclusive right 'to manufacture, use and sell drill bits, embodying all or any of the improvements covered by the said applica-

tions or letters patent or improvements thereof or additions thereto which may be made hereafter by either or any of the parties hereto.'

"It is further clearly contemplated, and defendant is obligated to endeavor to improve the commercial product and must avail himself of any or all combinations and, of course, pay royalties accordingly. Subdivision II is as follows:

" 'Party of the second part agrees to pay to parties of the first part a royalty of fifteen (15%) per cent. of the selling price of drills complete, or spare parts thereof, embodying improvements covered by the said applications or letters patent.'

" 'It is mutually understood and agreed that the party of the second part will endeavor to improve the commercial product as much as possible, and in so doing will avail himself of any or all combinations that may be developed by either party hereto, to improve the operations or increase the sale of oil well drills. If in such combinations or improvements the essential features of any of the patents covered by this agreement are employed as the basic element of such new combination, the royalty shall be fifteen (15%) per cent. of the selling price of such drills.'

" 'It is mutually agreed and understood that the development of any new combinations shall not be used as a reason for retiring from the market drills made in conformity to patent drawings, but that in the event of development of any new combination or element the party of the second part shall continue to offer for sale drill made in accordance with said patents, unless mutually agreed in writing to the contrary.

" 'The parties of the first part, each severally for himself, as evidenced by signatures attached hereto, agree to transfer by assignment to party of the second part any improvement that may in future be developed or invented by them, or any of them, in the type of drill covered by said applications and patents, and this agreement, the consideration of such assignments to be a royalty of fifteen (15%) per cent. of the selling price of such new improvements or inventions.

" 'The party of the second part agrees to use all reasonable diligence to develop, manufacture and offer for sale in quantities as the market may require, drills or spare parts thereof, embodying improvements covered by said applications or letters patent. It is understood and agreed that said drills and spare parts thereof are to be sold at

reasonable price and not to exceed the price at which other patent rock drills or similar type are, or may be, sold.'

"The clause of the contract under which plaintiff obligates itself to hold defendant harmless is No. V, as follows:

" 'The parties of the first part further hereby agree to protect the said letters patent from infringements, and defend any such actions if commenced, in consideration of the party of the second part assuming the cost of manufacturing and marketing drills embodying such improvements, and if any such actions are prosecuted to a final judgment or judgments, the said party of the first part shall pay such judgment or judgments, including all costs of suit or suits, it being the intention hereby to protect and save harmless the said party of the second part against the claims of infringement of any and all persons, firms or corporations whomsoever. In the event the party of the second part shall be required to advance funds for the account or protection of the interests of the parties of the first part, and or elects to do so, under this clause such funds so advanced shall be charged to the account of and deducted from any royalties that may be due or thereafter become due the parties of the first part.' "

The significant features of the contract are: (a) That defendants obligate themselves to pay a royalty of 15 per cent. of the selling price of the drills embodied in the patent covered by the license whether such drills were employed alone or in combination with improvements that may be developed by either party hereto, while the plaintiff, party of the first part, (b) obligated itself to transfer by assignment any improvements which it may in future invent, and (c) to protect the letters patent from infringement.

This agreement for protection covered: (1) An agreement to defend infringement actions; (2) to pay any judgments recovered in any such infringement action; and (3) that in the event the defendants should be required to advance funds for the account or protection of the interests of plaintiff under this clause No. V such funds so advanced should be charged to and deducted from the royalties.

[1] It is the defendants' claim that since the royalties are the fruits of the contract, it must be considered that the expenses of those litigations, the result of which was to affirm, rather than to annul, the contract, were expenses incurred in the interest of the plaintiff, and therefore the items in Exhibit

B are recoverable under article V; and it is further contended that aside from the provisions of the contract, the action of the plaintiff in seeking to defeat it was in bad faith, and subjected it to the obligation to reimburse defendant in his expenses incurred in maintaining the contract for the joint interest of both.

To neither of these contentions can I give my assent. The claim that the expenses are protected under clause V of the contract I think untenable on two grounds: (1) That clause is limited to moneys advanced on account of "infringement" actions, for if the last paragraph of clause V is not limited by its context and its terms to infringement suits, then it is broad enough to cover any expense incurred in the prosecution of the business by the defendants, which construction would nullify the royalty clause by charging the plaintiff with all of the moneys advanced by the defendants in pushing, promoting and selling its drills.

Such a construction would bring plaintiff into the position of one sharing with defendants in the profits, while paying all the losses, which would be directly contrary not only to the terms of the contract, but to equitable principles.

In addition, the broad claim that expenses paid by defendant in an adversary litigation with plaintiff can be held to be funds advanced for the protection of the interests of the plaintiff is contrary to common sense, and would deprive the plaintiff of the undoubted right to litigate with the defendant as to the validity of his contract, except upon penalty of having to pay for both sides of the litigation.

Neither does the theory of implied obligation sustain the defendant, for it has never been and cannot be held that an assignee cannot in good faith maintain a suit to annul an assignment except at the risk of being subjected to the payment of the expenses of the adversary party.

The claim of the defendants to offset the items in Exhibit B is therefore rejected in whole.

[2] The principal insistence of the defendants is upon allowance of the items in Exhibit D, and with much ingenuity and vigor the claim is pressed that the plaintiff is by virtue of the provisions of clause No. V, of the contract obligated to reimburse the defendant for the expense of defending, and the judgment obtained in equity No. 124, in which suit the Hughes Tool Company recovered a judgment condemning the defendant as an infringer and to pay the damages growing thereout.

Of course, it must be conceded that clause No. V provides for defendant what it claims to provide, full protection against the claims of infringement of any and all persons, firms, or corporations whomsoever, provided of course the claim of infringement is made as against devices covered by the assignment. Certainly the claim cannot be construed to cover infringement controversies in which Reed may get himself involved, by making assertions not covered by the Caddo assignment.

Defendants recognize this as the correct construction, and they assert that equity No. 124 was in reality a suit charging infringement against Reed by virtue of his efforts to use and sell the inventions embodied in the Caddo assignment, and the judgment obtained against him in that suit was a judgment for such infringement, and therefore directly within the protecting clause of said contract, and they seek to enforce and strengthen this assertion by pointing to the fact that in equity No. 124 it was by the court determined that the sale by the defendant of its drilling tools was brought about by and was due to its piracy from Hughes Tool Company of its lubricating device; but for the combination of which device with the Reed drilling tools it was held the royalty sales would not have been made.

Plaintiff's answer to these contentions is: (1) That the Caddo assignment did not cover either the bits, or the lubricator, which were the subject of the suit in equity No. 124; that these were outside the Caddo claims. (2) That if the bits in controversy were within that assignment and protected by clause No. V thereof, no damages were awarded against defendants in equity No. 124 for the use of those tools, and no judgment of infringement obtained. That as to the lubricator, not only do the claims of the patent assigned by Caddo to Reed not include that device, but the defendant himself has never claimed the right to use the lubricator under that assignment; has made no accounting to plaintiff for royalties upon lubricators sold, and at no time, either in the litigations, or prior or since, has he claimed a right under the Caddo assignment to use the lubricator; nor could he, for if the Caddo patents be construed to cover the lubricator, by a judgment in cause No. 790 in the District Court of the United States for the Western District of Louisiana, Sharp-Hughes Tool Co. v. Caddo Rock Drill Bit Co., equity No. 790, that company, prior to its

assignment to Reed, was enjoined from using the lubricating device upon which Hughes recovered in equity No. 124.

The question of whether defendants are entitled to offset against plaintiff the expenses of the litigation in equity No. 124 incurred prior to the decree of May 18, 1921, is not without difficulty, for the contention of defendant Reed in that suit was, not so much that Reed was entitled to use his bits and cutters because of the Caddo assignment, as that his device and that of Hughes was different; but I am of the opinion that the contract should be given as broad a construction as reason and common sense will admit of, and that under such construction it must be held that in so far as Reed defended equity No. 124 to the point of obtaining a judgment of noninfringement as to his bits, the expenses of the litigation, as set out in Exhibit D, are recoverable.

As to all of the expenses of the litigation thereafter up to the time of the final decree, and as to the judgment in the final accounting, I think it clear that no provision of the contract set out entitles the defendants to claim these as offsets to the plaintiff's royalties.

The contract for royalties obligated the defendant to pay 15 per cent. of the sales. It did not obligate plaintiff to pay one cent of the selling costs; but were the court to adjudge plaintiff obligated to pay a judgment entered against Reed because he used a lubricator unlawfully, the use of which lubricator the court found was an excellent selling device, the court would be in effect charging Caddo with part of the costs of Reed's selling campaign.

This consideration, that Caddo does not have to pay either costs or losses, is sufficient answer to the claim so strongly asserted by defendants, that since plaintiff was receiving the benefit of Reed's wrongful activities, it ought to pay the losses.

Of course, if the defendants could maintain that the lubricating device was assigned to it by Caddo, that it relied upon said assignment, that it used the device under the protection thereof, that it paid royalties upon the lubricators sold, relying upon that protection, and that in what it did it was in the interests of the plaintiff asserting the validity of the Caddo patent, it would, as has been said above, be entitled on the contract to its reimbursement. But every line in the record in this case, and in the others tried, establishes as to the lubricator that Reed never claimed the right to it by virtue of the Caddo assignment. In equity No. 124

he denied successfully that he was claiming under the Caddo license the right to use the lubricator, and thus he avoided the effect of the estoppel of the judgment in cause 790; and, finally, when he came to make up his royalty statements, he did not include in them royalties on the pirated lubricators.

Much has been said in argument about the ownership by Hughes of a large part, if not all, of the stock in both the Caddo Company and the Hughes Tool Company, and this fact has been pressed as having controlling bearing upon the issues.

It cannot be denied that the fact of that dual ownership adds piquancy and drama to an otherwise prosy tale, nor that from a dramatic standpoint the dénouement would be far more interesting and far more in accord with the Greek view of unity if the final result of all the struggle and contention between Hughes and Reed in their many litigations would be that one hand wipes the other; that Hughes, as Caddo, should pay himself as Hughes Tool Company with the final result a standoff.

Such an outcome would be good drama, but poor law; would point a moral or adorn a tale, perhaps, but defeat justice in the doing. Passing the fact shown in equity No. 124 that at the time of the assignment by Caddo to Reed, Hughes owned only about 26 per cent. of the capital stock of the Caddo Company, and assuming that defendants' contention that Hughes owned practically all of the stock in both companies is correct, to take defendants' view of the matter would be to permit a defendant, adjudged to have done a wrong, to escape the consequences of that wrong merely because of the fortuitous circumstance that the person to whom he did the wrong happens to be the same person with whom he has a contract.

Each of these controversies must stand on its own legal merit unaffected by the fact of the pendency or result of the other, and I must wholly reject the notion that their solution should or could be determined by the fact of who owned the stock in the two companies with which the defendants in the case have had their litigations.

The question in equity No. 124 on the accounting was whether Reed had damaged plaintiff Hughes Tool Company, and it was adjudged that they had.

The question here is whether the expenses of that litigation after the decree of May 18, 1921, and the judgment in it were within the scope of clause V of the royalty contract, as expense incurred by, and a judg-

ment recovered against, Reed in an infringement action as provided in that clause. If they are, Reed should have them offset. If they are not, Reed should not, and the question of stock ownership has no legal bearing on the solution.

Believing as I do that the question is settled most clearly by the evidence against Reed's contention, I reject as allowable offsets all the expense in Exhibit D, including the judgment, in Equity No. 124 incurred after the decree of May 18, 1921.

Let a judgment be drawn in accordance with this opinion for plaintiff for the royalties less the offsets here allowed against them.

### Contract.

State of Louisiana, Parish of Caddo.

This agreement made and entered into on this 3d day of February, 1917, by and between the Caddo Rock Drill Bit Company, a corporation organized and existing under the laws of the state of Louisiana, having its domicile in the city of Shreveport, Caddo parish, Louisiana, herein represented by its president, W. L. Young, who is duly authorized by resolution of the board of directors to enter into this contract, and George W. Robinson, in his individual capacity and as trustee for Granville A. Humason and others, parties of the first part; and C. E. Reed, a resident of the city of Houston, county of Harris, state of Texas, party of the second part, witnesseth:

That whereas, said parties of the first part are the owners of all the rights, title and interest in and to a certain application of Granville A. Humason for improvements in drill bits filed in the United States Patent Office February 10, 1913, serial No. 747,461; patent No. 1,-294,106; U. S. letters patent No. 1,120,198, issued to Granville A. Humason December 8, 1914; U. S. letters patent No. 1,151,104 issued to Granville A. Humason August 24, 1915; U. S. letters patent No. 1,191,310 issued to Granville A. Humason July 18, 1916. Also applications for patents on the same devices and improvements in Russia, Mexico and Canada, and are desirous of placing on the market drill bits embodying improvements covered by the said applications and patents; and

Whereas, the party of the second part is desirous of acquiring license to use, manufacture, and sell, and all other privileges under the patents in respect of the use and sale of said inventions, and improvements thereof, and also place same on the market for sale:

Now therefore, said parties do hereby mutually agree as follows:

I. The parties of the first part in consideration of the payments, covenants and agreements hereinafter contained on the part of the party of the second part, do hereby grant, bargain and sell during the lifetime of the patents issued, or to be issued on the applications, the sole and exclusive right to manufacture, use and sell drill bits embodying any or all of the improvements covered by the said applications or letters patent, or improvements thereof or additions thereto, which may be made hereafter by either or any of the parties hereto.

In consideration of said license the party of the second part agrees as follows:

II. Party of the said part agrees to pay to parties of the first part a royalty of fifteen (15%) per cent. of the selling price of drills complete, or spare parts thereof, embodying improvements covered by the said applications or letters patent.

It is mutually understood and agreed that the party of the second part will endeavor to improve the commercial product as much as possible, and in so doing will avail himself of any or all combinations that may be developed by either party hereto, to improve the operation or increase the sale of oil well drills. If in such combinations or improvements the essential features of any of the patents covered by this agreement are employed as the basic element of such new combination, the royalty shall be fifteen (15%) per cent. of the selling price of such drills.

It is mutually agreed and understood that the development of any new combination shall not be used as a reason for retiring from the market drills made in conformity to patent drawings, but that in the event of development of any new combination or elements the party of the second part shall continue to offer for sale drills made in accordance with said patents, unless mutually agreed in writing to the contrary.

The parties of the first part, each severally for himself, as evidenced by the signatures attached hereto, agree to transfer by assignment to party of the second part any improvement that may in future be developed or invented by them, or any of them, in the type of drill covered by said applications and patents, and this agreement, the consideration of such assignments to be a royalty of fifteen (15%) per cent. of the selling price of such new improvements or inventions.

The party of the second part agrees to use all reasonable diligence to develop, manufacture and offer for sale in quantities as the market may require, drills or spare parts thereof, embodying improvements covered by said applications or letters patent. It is understood and agreed that said drills and spare parts thereof are to be sold at a reasonable price and not to exceed the prices at which other patent rock drills of similar type are, or may be, sold.

III. It is mutually desired and intended to market drills embodying improvements covered by this agreement as early as possible, and the party of the second part agrees to facilitate the early marketing in every way possible under existing circumstances, and in view of the heavy investment in machinery and steel necessary for the manufacturing and sale of oil well drills by the party of the second part, the parties of the first part hereby agree to diligently prosecute to final decision the Interference Case No. 26,133 Hughes v. Humason, now pending in the United States Patent Office on appeal by Hughes.

IV. The party of the second part will keep full, true and accurate books and accounts, showing the number of drills and spare parts manufactured under this agreement, sold and on hand for sale, which books and accounts shall be open to inspection of party of the first part during all business hours.

The party of the second part will, on or before the tenth day of each calendar month, render full report in writing to party of the first part, showing the number of drills and spare parts manufactured, sold or on hand for sale during the preceding month, and will pay all royalties accrued thereon within thirty days (30) after the rendering of such account, with interest at six (6%) per cent. per annum on all royalties not so paid within stipulated time.

V. The parties of the first part further hereby agree to protect the said letters patent from infringements, and defend any such actions if commenced, in consideration ·of' the party of the second part assuming the cost of manufacturing and marketing drills embodying such improvements, and if any such actions are prosecuted to a final judgment, the said party of the first part shall pay such judgment or judgments, including all costs· of suit or suits, it being the intention hereby to protect and save harmless the said party of the second part against the claims of infringement of any and all persons, firms or corporations whomsoever. In the event the party of the second part shall be required to advance funds for the account or protection of the interests of the parties of the first part, and or elects to do so, under this cause, such funds so advanced shall be charged to the account of and deducted from any royalties that may be due or thereafter become due the parties of the first part.

VI. Whereas, it appears that under date of December 17, 1914, a certain instrument was signed by John L. Kimbell, J. C. Willis, G. W. Robinson, and others, conveying to Mr. Humason the right to make and sell for his own account fifty (50) Caddo Rock drill bits or gumbo busters in accordance with the terms of said instrument, which right has been· sold or pledged by said Humason, the parties· of the first part hereby agree to secure by purchase or otherwise, the return to them of this instrument and right, and all other rights or licenses that may have been granted heretofore, and to cancel the same, so that the transfer of "sole and exclusive right to manufacture, use and sell," as stated in article I hereof, shall not be subject to any outstanding obligations, agreements or licenses whatsoever.

VII. The party of the second part hereby agrees to perform diligently all of the agreements and covenants of this contract and particularly that one in reference to the sale and marketing of a drill embodying the improvements covered by the said application and letters patent, and agrees not to market a similar tool or device to, the prejudice of this one. Provided second party shall have the right to manufacture, sell and dispose of, on any market drills, bits and devices under his own patents, issued to him by the United States, No. 1,159,-087 and 1,159,088.

VIII. It is further agreed between the parties hereto, that if at any time it shall appear that the party of the second part has made default in substantially performing any agreement herein contained on its part to be kept and performed, the parties of the first part shall give notice in writing to the party of the second part setting out in full such alleged default. Failure of party of the second part to correct such, after such notice, any default in substantially performing all of the agreements herein contained shall make void all rights, privileges and interest created by this agreement, and the same shall revert to the parties of the first part.

IX. It is understood and agreed by the parties hereto that the party of the second part shall, within eighteen (18) months from this date, begin to manufacture and market the finished product covered by this agreement in commercial quantities as the market may require, the party of the second part agreeing to make all preparations for the purpose· of placing said bit on the market at the expiration of the stipulated time. But should the second party be prevented by infringement suits, or injunctions or other litigation involving the patents of the first parties, from proceeding with the manufacture and sale of said tool and device, then the time during which he is so prevented shall be deducted and said eighteen (18) months shall be extended to that extent.·

In testimony whereof the parties signed hereto in the presence of the undersigned legal and competent witnesses on the 3d day of Feby. 1917. Caddo Rock Drill Bit Co., by W. L. Young, President. G. W. Robinson, Trustee. Witnesses signatures of Caddo Rock Drill Bit Co. and G. W. Robinson: Attest: W. C. Nelson, J. B. Ardis. C. E. Reed. Witnesses signatures of C. E. Reed: Attest: C. A. Teagle, W. S. Hunt.

"Approved by the following directors and, stockholders: John L. Kimbell. C. F. Brown. Mrs. A. E. Brown. J. C. Willis. J. M. Robinson. Granville A. Humason.